# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHERYL LYNN LITTLE DOG,<br><br>Defendant. | CR 16-09-GF-BMM<br><br><br>**ORDER** |

## SYNOPSIS

The Grand Jury returned an Indictment charging Cheryl Little Dog with Harboring a Fugitive, in violation of 18 U.S.C. § 1071, and False Statements to Federal Law Enforcement, in violation of 18 U.S.C. § 1001(a)(2). (Doc. 1.) Little Dog now moves to suppress all evidence discovered during a second warrantless search of her residence, including the presence of the fugitive. (Doc. 15 at 6.)

This Court held a hearing on the Motion to Suppress on April 28, 2016. (Doc. 24.) Deputy United States Marshall Logan Bryce and FBI Special Agent Mark Zahaczewsky testified at the hearing for the Government. Little Dog presented no witnesses.

1

Following the hearing, the Court ordered the parties to submit simultaneous supplemental briefs. (Doc. 25.) The Court ordered the parties to address whether Little Dog voluntarily consented to both searches, and whether exigency existed, in light of the record developed at the hearing. (*Id.*)

Little Dog consented to both the first and second search of her residence. The testimony presented at the hearing raised some concerns whether the presence of multiple officers with gun drawn at Little Dog's house caused Little Dog to feel compelled to consent to two separate searches of her house. A careful review of the testimony presented at the hearing, however, indicates that Little Dog has failed to rebut the testimony from Bryce and Zahaczewsky that she voluntarily consented to these searches. As a result, Little Dog's consent remains valid in light of the totality of the circumstances surrounding the two searches as developed during the hearing. This Court will not suppress any evidence obtained during either search.

## BACKGROUND

The United States sought Frank Gallardo on outstanding federal charges of abusive sexual contact of a minor from the District of South Dakota, as well as an arrest warrant out of Pueblo County, Colorado. A nation-wide law enforcement alert cautioned that Gallardo may be armed and dangerous. Gallardo subsequently fled to Montana and the Blackfeet Indian Reservation.

A concerned acquaintance of Little Dog tipped off the Federal Bureau of Investigation ("FBI") in Shelby, Montana. The acquaintance claimed to have observed Little Dog and Gallardo at a traditional native ceremony in Browning, Montana, over the weekend of October 10–11, 2015. Various law enforcement officers arrived at Little Dog's residence in East Glacier, Montana in an attempt to locate Gallardo on October 16, 2015. These officers included agents from the FBI, the U.S. Marshals, the Glacier County Sheriff's Department, and Blackfeet Law Enforcement.

Deputy Bryce and Agent Zahaczewsky, with other officers, approached Little Dog's residence. The officers spoke with a juvenile male outside the residence ("T.P."). T.P. confirmed to the agents that his grandmother (Little Dog), and her boyfriend, were inside the house.

Officers showed T.P. a photo of Gallardo. T.P. identified Gallardo as the man inside the house. These officers testified at the hearing that they heard someone bolt the door as they were talking to T.P. Officers knocked and announced their identity. Deputy Bryce declared that if Little Dog did not open the door he would be forced to "kick it in." (Doc. 27 at 19; 48; 60; 76.)

Deputy Bryce testified that Little Dog opened the door after a short delay. Deputy Bryce explained that Little Dog struggled to open the door as she had to back up her wheelchair to accommodate the inward opening door. Little Dog

provided officers with verbal consent to begin searching the house and the attic. (Doc. 27 at 62–63.) Officers failed to find Gallardo during this search.

Deputy Bryce interviewed Little Dog while other officers conducted the search. The various agents, including Deputy Bryce, were aware of Little Dog's status as a Blackfeet tribal council member. (*Id.* at 8; 15; 52–53; 57.) Deputy Bryce testified that he has "several contacts" with Little Dog from 2013–2014 regarding the tribal council. (*Id.*)

Deputy Bryce squatted next to Little Dog as he posed questions. Deputy Bryce had put away his Taser before sitting down to converse with Little Dog. Little Dog admitted that Gallardo had been at the residence. Little Dog claimed, however, that Gallardo had left a few days earlier and that she had not seen him since that time.

Deputy Bryce explained to Little Dog Gallardo's status as a federal fugitive wanted for felony child abuse in South Dakota. Deputy Bryce testified that Little Dog "steadfastly denied that [Gallardo] was in the house." (Doc. 27 at 62.) Deputy Bryce testified that he pressed her, and she said, "[w]ell, he's not here, you can look." (*Id.* at 22; 62.) Deputy Bryce continued to converse with Little Dog while officers proceeded to search her residence.

Little Dog provided Bryce a non-working telephone number for Gallardo. At Bryce's request, she attempted to call the number, but could not reach Gallardo.

4

The officers left their business cards with Little Dog. The officers instructed Little Dog to call them if Gallardo reappeared. The officers departed the residence.

Deputy Bryce testified that he has known Little Dog "for several years." (Doc. 27 at 52.) Deputy Bryce described Little Dog as a "very strong and authoritative woman, a proud woman." (*Id*. at 53.) Bryce previously had encountered Little Dog in her role as a tribal council member in which she freely had expressed her concerns regarding the actions of federal agents on the Blackfeet Indian Reservation. Little Dog's willingness to challenge federal agents in protecting what she believed to be the tribe's best interest led Bryce to develop his view of Little Dog. As a result, Little Dog's demeanor on the day of the search caught him off guard. Deputy Bryce testified that Little Dog's demeanor during the first search "was like [he] had never encountered it before. It was very cooperative, nice, pleasant, very helpful." (*Id*. at 63.)

After leaving the residence, two officers—Deputy Bryce and Special Agent Zahaczewsky—testified that they believed that Gallardo still could be in the house. The officers cited Little Dog's cooperative demeanor during the interview and T.P.'s response to questioning outside the house. Deputy Bryce testified that "specifically, for [him, Little Dog's] demeanor and the way she acted towards [him] and with [him] just did not add up." (Doc. 27 at 65.) Deputy Bryce testified

to his impression that he and the other agents "had missed this guy." (*Id.*) They returned to Little Dog's residence.

Little Dog answered the door upon the officers' return. The officers informed Little Dog that something did not seem right. The officers admitted to Little Dog that they had neglected to search the crawl space under the house. Little Dog claimed that her house had no crawl space. The officers noted, however, that vents in the floor suggested the existence of an opening under the structure. When Deputy Bryce pressed Little Dog about the existence of a crawl space, she responded, "[w]ell, it must be in the kids' room, go look." (Doc. 27 at 28–29; 68.) Little Dog followed the officers to the back of her home.

The officers found a trap door in a back bedroom covered by laundry. The officers ordered Gallardo to come out. After getting no response, Deputy Bryce climbed inside the crawl space. Deputy Bryce found Gallardo hiding under a blanket next to the foundation. After several moments of discussion, Gallardo agreed to come out peacefully. The officers arrested Gallardo and returned him to South Dakota to face the original charges.

## DISCUSSION

The Fourth Amendment provides for the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. Amend. IV. Reasonableness constitutes the ultimate

touchstone of the Fourth Amendment. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Searches and seizures inside a home without a warrant presumptively prove unreasonable. *Payton v. New York*, 445 U.S. 573, 585–586 (1980). The Supreme Court characterizes physical entry of the home as the "chief evil" against which the wording of the Fourth Amendment remains directed. *Id*. Exceptions to the warrant requirement are "narrow" and their boundaries are "rigorously guarded" to prevent any expansion that would unduly interfere with the sanctity of the home. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

Little Dog argues that the Government obtained all the evidence against her through a "series of unreasonable actions" that culminated in a warrantless search. (Doc. 15 at 6.) Little Dog claims that no exception to the warrant requirement justified the search. She maintains that the officer obtained involuntarily any consent that she may have provided. The Government contends that officers did not coerce Little Dog's consent to the search of her home. The Government also claims that exigent circumstances and principles of inevitable discovery support the search. (Doc. 18 at 7.)

**Consent**

Law enforcement may enter and search a third-party's residence based on an arrest warrant, and without a search warrant, when either consent or exigency exists. Arrest warrants alone do not give law enforcement authority to enter any

residence where they believe a suspect may be located. *See generally O'Rourke v. Hayes,* 378 F.3d 1201 (11th Cir. 2004). Law enforcement instead must obtain a search warrant for the third-party's residence, even in searching for a fugitive, unless the third-party consents. *Steagald v. United States*, 451 U.S. 204, 222 (1981).

A person may authorize a warrantless search through voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The Court analyzes the validity of the consent and the reasonableness of the search from an objective standpoint. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991). The Court must determine the objective reasonableness of any exception to the warrant requirement from the totality of the circumstances. *United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011).

The Court analyzes voluntariness using a five-part test: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether officers gave Miranda warnings; (4) whether officers notified the defendant that she had a right not to consent; and (5) whether officers told the defendant that they could have obtained a search warrant. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)). It is not necessary for a court to "check off all five factors." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)

(quoting *Chan–Jimenez*, 125 F.3d at 1327 n. 3). The Ninth Circuit has upheld consent as voluntary in many cases where at least several of the factors were present. *Id*.

**Factors**

The parties concede that Little Dog was not in custody during either search of her residence. The parties also concede that officers failed to provide Little Dog with Miranda warnings. No such warnings were necessary under these circumstances as the officers did not intend to arrest Little Dog. (Docs. 18 at 10; 27 at 37–38; 70–71.) These factors weigh in favor of a finding of voluntariness.

The parties also do not dispute that officers failed to inform Little Dog of her right to refuse consent. This factor appears neutral as courts do not require officers to inform a person being searched that she has a right to refuse consent. This information simply weighs in favor of finding consent. *United States v. Vongxay*, 594 F.3d 1111, 1120 n.6 (9th Cir. 2010).

Similarly, the parties do not dispute that officers failed to inform Little Dog that they could obtain a search warrant for her home should she refuse consent to search. The Government argues that law enforcement remains in a "no win" position with regard to this factor. The Government points out that compliance with this factor either could enhance voluntariness of the consent or could be

9

considered a threat designed to coerce consent. *See United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994).

The parties agree that the various officers had drawn their weapons during the first search. Deputy Bryce and Special Agent Zahaczewsky did not draw their weapons, however, during the second search. The Government argues that officers reasonably drew their weapons before the first search in light of their concern about the possible presence of a fugitive whom they believed to be armed and dangerous.

The Government contends that the officers drew their weapons only after T.P. confirmed the presence of Gallardo inside the home and they heard someone bolt the door as they approached. Little Dog argues that the officers' drawing of their weapons undermines any claim that she voluntarily consented to allow officers into her home. Little Dog further claims that the presence of more than two officers and Deputy Bryce's threat to "kick the door in" evidences coercion on the part of the officers. The Court agrees that this factor, taken alone, supports a finding of involuntariness.

Several of the factors help provide a fuller picture of the search. Ten minutes elapsed between the ending of the first search and the beginning of the second search. Little Dog had time to consider the events of the first search when officers

requested consent for the second search. These events included the officers leaving the house after having completed the first search.

The first search consisted of a team of officers. The second search consisted only of Deputy Bryce and Special Agent Zahaczewsky. This second search lacked the level of intensity of the first search. The officers had drawn their weapons during the first search. Deputy Bryce testified, however, that he had put away his Taser before sitting down to converse with Little Dog. Deputy Bryce testified further that neither he nor Special Agent Zahaczewsky drew their weapons during the second search.

Little Dog had time to withdraw or limit her consent before, or even during, the second search. The Government argues that Little Dog's failure to object during the second search indicates that she consented to the entire search and everything that it revealed. *See United States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983); *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986).

The Government stresses that Little Dog provided verbal consent for both searches. The Government notes that Little Dog accompanied officers to the back bedroom during the second search. Little Dog's willingness to accompany the officers during the search further demonstrates her consent.

Deputy Bryce and Special Agent Zahaczewsky provided the only description of the events surrounding either search. The officers testified that Little Dog's

demeanor was cooperative and helpful during both searches. (Doc. 27 at 22; 24–25; 28; 38; 63; 65.) The officers testified that Little Dog did not appear afraid of the officers at any point. (*Id.*) The officers testified that Little Dog provided verbal consent for both searches. (Doc. 27 at 22; 28–29; 62; 68.) Little Dog failed to rebut any of the officers' testimony with her own.

The Court concedes the inherently coercive effect that the first search may have had on the second. Based upon the totality of the circumstances, however, the Court will not suppress evidence in this case because it remains convinced that Little Dog voluntarily provided consent to both searches of her residence. In light of the Court's ruling, it declines to reach the other arguments raised by the Government in support of the search.

Accordingly, **IT IS ORDERED** that Little Dog's Motion to Suppress Evidence (Doc. 14) is **DENIED**.

**DATED** this 31st day of May, 2016.

Brian Morris
United States District Court Judge